**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**ROBERT PORTER** **PLAINTIFF**

**v.** **4:08CV00637-WRW**

**HARTFORD LIFE & ACCIDENT INSURANCE COMPANY** **DEFENDANT**

**ORDER**

Pending are Plaintiff's Motion for Summary Judgment (Doc. No. 22) and Defendant's Motion for Summary Judgment (Doc. No. 25). Each party has responded and replied.[1] For the reasons set out below, Plaintiff's Motion is GRANTED, and Defendant's Motion is DENIED.

## I. BACKGROUND

Plaintiff was a board-certified orthopedic surgeon at OrthoArkansas, P.A. ("OA"), and was a participant in OA's Group Long-Term Disability Income Protection Plan (the "LTD Plan"). Continental Casualty Company Policy SR-83074913 (the "1999 Version") insured benefits payable under the LTD Plan until Group Policy No. 83161865, effective March 1, 2001 ("the 2001 Version"), replaced the 1999 Version.[2]

The 1999 Version defined disabled as follows:

> You are considered disabled and eligible for benefits if, due to an accident or sickness which causes loss commencing while your coverage is in force, you are unable . . .
>
> to perform each of the material duties pertaining to your specialty in the practice of

---

[1]Doc. Nos. 30, 32, 42, 43.

[2]Unless otherwise noted, the background is taken from the parties' statements of material facts. Doc. Nos. 24, 25, 30, 35.

medicine (for doctors) or occupation (for other insured personnel); or to perform all of the material duties of your regular specialty (for doctors) or occupation (for other insured personnel) on a full-time basis, but are

a. performing at least one of the material duties of your regular specialty/occupation or another occupation on a part-time or full-time basis, and

b. currently earning less than 80% per month of your pre-disability earnings due to that same injury or sickness.

I understand this language to mean that a doctor is disabled if he cannot perform the material duties of his specialty in the practice of medicine, even if the doctor is working in another occupation, so long as he is earning less than 80% per month of his pre-disability earnings.

The 1999 Version reads:

You are eligible for your full Disability Benefit when you are not able to produce (earn) over 20% of pre-disability production (income) from your specialty (for doctors) . . . or when you are not earing over 20% of pre-disability income from another specialty in the practice or medicine, *or any other occupation*.

Immediately following the Elimination Period or immediately following any period for which the full Disability Benefit has been paid, a Rehabilitation Benefit is payable for a given month when you are able to produce (earn) over 20% but less than 80% of pre-disability production (income) from your own specialty or occupation, or when you earn over 20% but less than 80% of pre-disability income from another specialty in the practice of medicine, *or any other occupation*.

Base year production is the average of monthly bookings (income) you produced (earned) during the last full calendar year of your practice or occupation prior to your date of loss. The amount of Rehabilitation Benefit payable for a given month will be 100% of your full benefit less that percent which is the relationship of current monthly production (income) to base year monthly production (income). If, for example, you produce 56% of base year production in a given month, 44% of your full benefit is payable for that month.[3]

[3]Emphasis added.

The 2001 Version contained a provision reducing LTD benefits when a claimant's post-disability earnings exceeded 20% of pre-disability income:

> After the first 12 months of Gainful Employment, the Work Incentive Benefit will be equal to the Net LTD Monthly Benefit amount less that percent which is the relationship of current monthly Disability Earnings or Disability Production to base year monthly Earnings (Production). If, for example, you produce 56% of base year production in a given month, 44% of your full benefit is payable for that month. If 20% or less of base year Earnings (Production) is generated in a given month, as a result of Your Disability, Your full benefit is payable for that month. This benefit is payable for the full benefit period, or until you are able to earn (produce) 80% or more of your base year Earnings (Production).[4]

The 2001 Version included two provisions that were not in the 1999 Version. First, it granted CNA Group Life Assurance Company the discretion both to determine eligibility for benefits and to interpret the terms and provisions of the LTD Plan, which means claims decisions would be analyzed under an abuse of discretion standard under the 2001 Version. A 2002 endorsement gave that discretion to Hartford. Next, the 2001 Version explained the process that would be followed to recover overpayments made to participants and expressly reserved to Hartford the right to subrogation and reimbursement.

In March, 2000, Plaintiff became physically unable to work as an orthopedic surgeon. Plaintiff started receiving LTD benefits in June, 2000, and has received LTD benefits attributable to the time period June 2000 through October 19, 2007.[5]

---

[4]Doc. No. 25-2.

[5]CNA terminated Plaintiff's benefits on May 18, 2001. Plaintiff appealed the decision and CNA reinstated Plaintiff's benefits on August 17, 2001, retroactive to the date the on which the benefits had been terminated.

Plaintiff began working as a financial consultant for Stephens, Inc. on January 1, 2002.[6] While Plaintiff was receiving LTD benefits, during some months at Stephens Plaintiff earned more than 20% of his pre-disability income – which would trigger the offset provision in both the 1999 and 2001 Versions. During some months, Plaintiff earned more than 80% of his pre-disability income -- which would preclude Plaintiff from benefits during those months. A spreadsheet entitled "Month by Month Breakdown of Overpayment w/ Adjustments for Corrected COLAs" reflects the amount of LTD benefits payable to Plaintiff for the period of January, 2002, through June, 2008. This same spreadsheet also reflects the applicable offset based on the LTD benefit and the earnings received by Plaintiff from Stephens. The parties apparently agree on the figures that appear in that spreadsheet.

Defendant did not reduce Plaintiff's LTD benefit payments by the applicable offset from 2003 to 2007, which resulted in overpayments to Plaintiff. Defendant, however, first requested Plaintiff's monthly pay stubs from January, 2002 through March 31, 2008, only on March 14, 2008. [7] In response, Plaintiff provided all pay stubs requested.

An October 19, 2007, letter from Defendant to Plaintiff informed Plaintiff that "no LTD benefits are payable beyond December 31, 2006 due to the level of earning you are receiving from work."[8] The October 19, 2007, letter cites the language from the 1999 Version defining disabled, and later states "[w]e based our decision to terminate your claim on policy language."[9]

---

[6]Defendant was apparently aware of Plaintiff's employment with Stephens as of February, 2003.

[7]Defendant had previously requested only yearly tax returns, which Plaintiff provided.

[8]Doc. No. 35.

[9]*Id.*

The same letter also informed Plaintiff that Defendant was not seeking reimbursement at that time for any overpayments, and that Plaintiff had a right to appeal the decision. The Hartford continued citing the 1999 Version in letters to Plaintiff's counsel well into 2008.[10] There is no mention of the 2001 Version in the administrative record.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[11] The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[12]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should only be granted when the movant has established a right to the judgment beyond controversy.[13] Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains.[14] I must view the facts in the light most favorable to the party opposing the motion.[15] The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

---

[10]See Administrative Record ("AR") 61.

[11]*Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56.

[12]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[13]*Inland Oil & Transport Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

[14]*Id.* at 728.

[15]*Id.* at 727-28.

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*,"[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.[16]

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[17]

## III. BENEFITS DECISIONS WILL BE ANALYZED UNDER THE TERMS OF THE 1999 VERSION

The parties debate whether the benefits decisions in this case should be construed under the 1999 or 2001 Version. Plaintiff contends that the provisions of the 1999 Version apply. Defendant maintains that benefits decisions should be reviewed pursuant to the terms of the 2001 Version.

Defendant cites a line of cases to support its position that the plan version in effect on the date that the claim accrues -- which is when a participant's claim is denied -- controls.[18] The cases cited by Defendant, however, can be distinguished from this case. For example, Defendant

---

[16]*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

[17]*Anderson*, 477 U.S. at 248.

[18]Doc. No. 26 (citing *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan*, 298 F.3d 191, 196-197 (3rd Cir. 2002); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003); *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1160-1161 (9th Cir. 2001); and *McWilliams, Jr. v. Metropolitan Life Ins. Co.*, No. 98-1732, 1999 U.S. App. Lexis 2047 (4th Cir. Feb. 11, 1999), among others).

cites *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan*.[19] In that case, the terms of the policy changed after the claimant was injured/disabled, but before the benefits were denied.[20] It appears that, in *Smathers*, the administrator actually relied on the newer version of the policy in making its benefits decision. No case cited by Defendant[21] discusses a plan missing from the administrative record.

Here, it is clear that the administrator relied on the 1999 Version, not the 2001 Version, when it decided in 2007 -- which is when Plaintiff's claim accrued -- that Plaintiff's benefits were no longer payable and should be reimbursed despite the fact that the 2001 Version apparently was in effect at that time. Under ERISA, employee benefit plans must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review . . . ."[22] A plan provides a participant a full and fair review only when "the claims procedures . . . [p]rovide that [the] claimant shall be provided . . . reasonable access to . . . information relevant to the claimant's claim for benefits."[23] Thus, after a denial of benefits, the claimant has the right to review materials relevant to his claim. Further, 29 C.F.R. § 2560.503-1(i)(5) entitles a claimant to review material relevant to his claim on appeal.[24]

---

[19] 298 F.3d 191 (3d Cir. 2002).

[20] *Id*. at 195-196.

[21] See Doc. No. 26, pgs. 7-8.

[22] 29 U.S.C. § 1133(2).

[23] 29 C.F.R. § 2560.503-1(h)(2)(iii).

[24] 29 C.F.R. § 2560.503-1(i)(5)

Defendant cites the 2001 Version in connection with denial of benefits and reimbursement in its Counter Claim and Motion for Summary Judgment. In other words, Defendant is relying on the 2001 Version in connection with its benefits decision. That makes the 2001 Version relevant. Yet, the 2001 Version is nowhere in the administrative record. It seems to me that allowing Defendant to rely on the 2001 Version without it being in the administrative record and without further analysis is not in keeping with the spirit of ERISA with respect to a full and fair review.

Thus, the analysis for determining which version applies is not identifying the plan in effect at the time the claim accrues, but is whether the Court may consider evidence outside the administrative record in reviewing benefits decisions.

As set out in *Farley v. Arkansas Blue Cross & Blue Shield*, when there is a palpable conflict of interest and it is necessary to determine the appropriate standard of review, "a plan need not be in the administrative record to be considered by the district court."[25] The Eighth Circuit Court of Appeals noted, though, that district courts will only rarely need to supplement the record to determine the appropriate standard of review.[26] In *Farley*, the relevant plan was in the record, but the participant asserted that Blue Cross Blue Shield was operating under a conflict of interest, and that the case should thus be analyzed under a more stringent standard.[27]

---

[25]*Farley v. Ark. Blue Cross & Blue Shield*, 147 F.3d 774, 776 n.4 (8th Cir. 1998) ("We note, however, that conducting limited discovery for the purpose of determining the appropriate standard of review does not run afoul the general prohibition on admitting evidence outside the administrative record for the purpose of determining benefits.").

[26]*Id.*

[27]*Id.*

The Eighth Circuit disagreed with the claimant (*i.e.*, did not supplement the administrative record), and used the abuse of discretion standard.[28]

The facts in *Barham v Reliance Std. Life Ins. Co.*[29] are more akin to this case than the facts in *Farley*. In September, 2003, Barham sued Reliance Standard Life Insurance Company ("Reliance") in connection with benefits denial.[30] In February, 2004, a Reliance employee who was "'authorized to make this Declaration on behalf of the company,'" filed the administrative record with the court and verified its accuracy and authenticity.[31] The policy under which Barham made her claim for benefits was in the administrative record.[32] That policy did not grant discretion.[33] Reliance attached to a brief a copy of a later version of the policy -- apparently the version that was in effect when the plaintiff's claim accrued -- without an affidavit verifying the policy's accuracy or authenticity.[34] The later policy granted discretion.[35]

The district court looked to the later policy and, because the later policy granted discretion, applied an abuse of discretion standard.[36] The Eighth Circuit Court of Appeals

---

[28]*Id*. at 777.

[29]*Barham v. Reliance Std. Life Ins. Co.*, 441 F.3d 581 (8th Cir. 2006).

[30]*Id.* at 583.

[31]*Id.*

[32]*Id.*

[33]*Id.*

[34]*Id.*

[35]*Barham*, 441 F.3d at 583.

[36]*Id.* at 584.

reversed the district court and remanded the case, instructing the district court to apply a *de novo* standard of review.[37] The Court wrote "even if [the later policy] had been submitted with a supporting affidavit, it would have been inappropriate for the district court to consider it unless Reliance also gave a satisfactory explanation for its contraction with the [earlier] affidavit."[38]

In this case, the 1999 Version is in the Administrative Record, which was authenticated by Jeanne M. Stowell.[39] Ms. Stowell's affidavit states "[t]he OrthoArkansas Plan at issue here . . . ."[40] The plan to which Ms. Stowell referred could have been only the 1999 Version. Defendant's decision that Plaintiff's benefits were no longer payable refers to the 1999 Version.[41] The Hartford references the 2001 Version in its counter claim,[42] and attaches the 2001 Version (along with an affidavit) to its motion for summary judgment. Defendant does not explain why the 2001 Version is not in the Administrative Record, or why the 2001 Version was not cited in any letter discussing the denial of Plaintiff's benefits. The Eighth Circuit has indicated that "district courts should not consider inherently contradictory affidavits submitted by the same party in summary judgment proceedings unless the party explains the inconsistency."[43]

---

[37]*Id.* at 585.

[38]*Id.*

[39]Doc. No. 20-2.

[40]*Id.*

[41]AR 61.

[42]Doc. No. 8

[43]*Barham*, 441 F.3d at 585 (citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364-65 (8th Cir. 1983)).

If the only difference between the 1999 Version and 2001 Version was the wording with respect to the definition of disability, the question of which version applied would not be so crucial, because, the definition is the same. However, the 2001 Version grants discretion, explains the process that would be followed to recover overpayments, and expressly reserved to The Hartford the right to subrogation and reimbursement.

I find that all benefits decisions in this case should be reviewed under the terms of the 1999 Version because Defendant never brought the 2001 Version to Plaintiff's attention and did not explain why.

## IV. ERISA STANDARD OF REVIEW

A denial of benefits under a plan governed by ERISA is to be reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[44] The 1999 Version did not grant discretion. Thus, the appropriate standard of review in this case is *de novo*.

## V. OVERPAYMENT AND REIMBURSEMENT

### A. ERISA Contract Interpretation

"The federal courts apply federal common law rules of contract interpretation to discern the meaning of the terms in an ERISA plan . . . , and under federal common law "a contract should be interpreted as to give meaning to all of its terms - presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous."[45]

As set out above, the 1999 Version defines disability as follows:

---

[44] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[45] *Harris v. Epoch Group, L.C.*, 357 F.3d 822, 825 (8th Cir. 2004).

> You are considered disabled and eligible for benefits if, due to an accident or sickness which causes loss commencing while your coverage is in force, you are unable . . .
>
> to perform each of the material duties pertaining to your specialty in the practice of medicine (for doctors) or occupation (for other insured personnel); or
>
> to perform all of the material duties of your regular specialty (for doctors) or occupation (for other insured personnel) on a full-time basis, but are
>
> a. performing at least one of the material duties of your regular specialty/occupation or another occupation on a part-time or full-time basis, and
>
> b. currently earning less than 80% per month of your pre-disability earnings due to that same injury or sickness.

So, if: a doctor is disabled if he cannot perform the material duties of his specialty in the practice of medicine, even if the doctor is working in another occupation, so long as he is earning less than 80% per month of his pre-disability earnings; a doctor will receive his full benefits as long as he is not earning more than 20% of his pre-disability income, either from the practice of medicine, or from working in another occupation; when a doctor earns 21% - 80% of his pre-disability income, he will receive his full benefit less a percent that is the relationship of his current income to his base year monthly income. The 1999 Version gives an example that explains this clearly: if you produce 56% of base year production in a given month, 44% of your full benefit is payable for that month; and because there is no termination provision, a doctor remains covered under the policy until the benefit period ends,[46] and if a doctor's monthly income falls below 80% of his pre-disability earnings, the doctor should receive the applicable

[46] AR 274 contains a table of the benefit periods.

percent of disability benefits. I believe this is consistent with how Defendant interpreted the 1999 Version.[47]

While the 1999 Version clearly defines disability and how benefits will be calculated, the policy is silent as to overpayment and reimbursement. Defendant availed itself of the equitable remedy of restitution when it began withholding disability payments to offset the overpayment it made to Plaintiff. Thus, ERISA contract interpretation ends here, where an analysis of the case under the principles of equity begins.

**B. ERISA and Equitable Remedies**

Under 29 U.S.C. § 1132(a)(3)(B)(ii), a fiduciary may sue to obtain equitable relief.[48] Thus, it is beyond question that restitution is an available equitable remedy for an ERISA fiduciary. But, there are no ERISA provisions that govern how a court should analyze the appropriateness of an equitable remedy in an ERISA case. When ERISA does not provide an express provision governing an issue, federal courts should fashion substantive law to fill in the gaps.[49] In ERISA cases, restitution is governed by federal common law "in ths shadow of ERISA."[50] Thus, "[w]hen a plan does not specifically allow for recoupment, but nevertheless it

---

[47]AR 294.

[48]29 U.S.C. § 1132(a)(3)(B)(ii).

[49]*Shipley v. Ark. Blue Cross & Blue Shield*, 333 F.3d 898, 902 (8th Cir. 2003). The Supreme Court encouraged federal courts to develop a "federal common law of rights and obligations under ERISA-regulated plans." See *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

[50]*Central States, Southeast and Southwest Areas Health and Welfare Fund v. Pathology Laboratories of Arkansas*, 71 F.3d 1251, 1254 (1995) (citations omitted.)

does so, it exercises extra-statutory devices . . . "[51] and will be analyzed under federal common law.

The first step in analyzing whether restitution is proper in an ERISA case is to determine which type of restitution the injured party is seeking. Restitution can be either equitable or compensatory.[52] Only equitable restitution is available under 29 U.S.C. § 1132(a)(3)(B).[53] "Monetary relief in the form of restitution is generally available only if the action seeks "'not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.'"[54] To determine if equitable relief is compensatory, a court asks "'whether the value of the harm done that forms the basis of the damages is measured by the loss to the plaintiff of the gain to the defendant, and whether the money sought is specifically identifiable as belonging in good conscience to the plaintiff.'"[55]

Here, the overpayment is a loss to Defendant and, considering that Plaintiff's benefits were to be reduced after his earnings reached a certain level, a gain for Plaintiff. Another question is whether the reimbursement Defendant seeks belongs to Defendant in good conscience. For the overpayment to belong to Defendant in good conscience, I must find that Plaintiff was unjustly enriched by Defendant's overpayments. While it appears that the Eighth Circuit has little precedent with respect to unjust enrichment in ERISA cases -- although unjust

---

[51]*Phillips v. Maritime*, 194 F. Supp. 2d 549 (E.D. Tex. 2001).

[52]*Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 944 (8th Cir. 1999).

[53]See *Id.*

[54]*Pichoff v. QHG of Springdale, Inc.*, 556 F.3d 728, 731 (8th Cir. 2009).

[55]*Id.* (citing *Calhoon v. Trans World Airlines, Inc.*, 400 F.3d 593, 596-97 (8th Cir. 2005).

enrichment is mentioned in *Kerr v. Charles F. Vatterott & Company*[56] -- there are ERISA unjust enrichment cases from other jurisdictions.

In *Rossi v. Boston Gas Company*,[57] the court found that the plaintiff would be unjustly enriched if allowed to keep a lump-sum social security benefit in addition to earlier "additional allowance" plan benefit payments that were made to approximate the plaintiff's social security benefit until the plaintiff became eligible to receive social security. After the plaintiff received social security benefits, the defendant sought restitution of earlier paid additional allowances.[58] The court determined that the under a reasonable reading of the plan, the plaintiff was not entitled to double benefits, and that the plan was entitled to restitution.[59]

In *Dandurand v. Unum Life Insurance Company of America*,[60] the plan overpaid the plaintiff for about four years before it noticed its miscalculation.[61] Although the plan was silent as to overpayment and reimbursement, the plan began to recoup its overpayment by withholding the plaintiff's monthly benefit.[62] The court, noting that "'equity, after all, was meant to be flexible,'"[63] found that restitution was not an appropriate remedy because: it was not the

---

[56]184 F.3d 938, 946 (8th Cir. 1999).

[57]No. 88-0079-WGY, 1994 U.S. Dist. Lexis 10922 (D. Mass. July 7, 1994).

[53] *Id.* at *5.

[59]*Id.* at *12.

[60]150 F. Supp. 2d 178 (D. Me. 2001).

[61]*Dandurand*, 150 F. Supp. 2d at 186.

[62]*Id.* at 184-85.

[63]*Id.* at 186.

plaintiff's fault that the error in benefits calculation occurred; that the defendant had not placed the plaintiff on notice that the defendant had mistakenly been overpaying plaintiff; and that the plaintiff used the benefits payments toward living expenses, and did not treat the overpayment as a windfall.[64]

In *Phillips v. Maritime Association - I.L.A. Local Pension Plan*,[65] the plan made overpayments to the plaintiff, and the plan did not contain any provision about recoupment. The plan reduced the plaintiff's monthly benefits to recoup its overpayment, but the court found that restitution was not an appropriate remedy because of a breach of fiduciary duty.[66]

Here, Defendant erroneously paid Plaintiff LTD benefits in 2003, 2004, 2005, 2006, and 2007 without reducing the benefits by amounts Plaintiff earned at Stephens, resulting in overpayment.[67] Plaintiff was not at fault for Defendant's erroneous calculation of Plaintiff's benefits. Based on the record, it appears that Plaintiff complied with all requests for financial information. In 2005, Defendant was aware that it should analyze Plaintiff's earnings to ensure his benefits should not be reduced,[68] but waited until March 14, 2008, to request monthly pay stubs to determine the applicable offset amount. The October 19, 2007, letter from the Hartford

---

[64]*Id.* at 186-87.

[65]194 F. Supp. 2d 549 (E.D. Tex 2001).

[66]*Phillips v. Maritime Association - I.L.A. Local Pension Plan*, 194 F. Supp. 2d 549, 555-556 (E.D. Tex 2001).

[67]AR 11-12, 87-220.

[68]See AR 395.

informs Plaintiff that "no LTD benefits are payable beyond December 31, 2006 due to the level of earnings you are receiving from work."[69] That same letter states:

> [N]o benefits should have been payable from January 1, 2007 through September 30, 2007. At this time, we are not seeking reimbursement for any overpayments that have occurred on your claim. We reserve the right to further determine if benefits have been overpaid, and, if so, in what amount. In the event benefits have been overpaid, additional money may be due back The Hartford.[70]

But then Defendant rethinks its position and retains Plaintiff's disability benefits to recover losses it incurred for overpayment from 2003 forward.[71]

I find that Defendant took unreasonably long to determine that it had been overpaying Plaintiff's benefits. Defendant knew the provisions of the 1999 Version, knew that offsets must be calculated based on monthly income, and yet waited until 2008 to ask for monthly pay stubs. "The longer it takes the recovering party to act the greater the chance there is that the recipient will have changed his or her circumstances."[72]

Because: (1) the great lapse in time between when Defendant should have become aware that it overpaid Plaintiff's LTD benefits and when Defendant did become aware of that fact; (2) the lapse in time was caused by Defendant's error; (3) based on the record, Plaintiff did not know he was being overpaid and was not at fault that Defendant did not discover its error; and (4) it is reasonable to assume that Plaintiff changed his circumstances based on his belief that

---

[69]AR 420.

[70]AR 422.

[71]Doc. No. 25.

[72]See *Kraft Foods, Inc. v. Woods,* No. 98 C 7794, 1999 U.S. Dist. Lexis 18169, (N.D. Ill. Nov. 19, 1999).

LTD payments he received as early as 2003 were his to keep, I find that restitution is not appropriate in this case. Accordingly, Defendant may not withhold any further disability benefits that are due Plaintiff under the 1999 Verison, and will reduce LTD benefit payments only if Plaintiff's income from another occupation exceeds 20% of his pre-disability income. Defendant will return to Plaintiff amounts it withheld to recoup its overpayments.

## CONCLUSION

Based on the findings of fact and conclusions of law above, Plaintiff's Motion for Summary Judgment (Doc. No. 22) is GRANTED, and Defendant's Motion for Summary Judgment (Doc. No. 25) is DENIED.

IT IS SO ORDERED this 23rd day of April, 2009.

/s/Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE